**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KHALID ABDULLAH, | : | CIVIL ACTION NO. 1:05-CV-1135 |
| | : | |
| Plaintiff | : | (Judge Conner) |
| | : | |
| v. | : | |
| | : | |
| ANTHONY FETROW and | : | |
| YORK CITY POLICE DEPARTMENT, | : | |
| | : | |
| Defendants | : | |

**MEMORANDUM**

This is a § 1983 civil rights action filed by plaintiff Khalid Abdullah

("Abdullah").  Presently before the court is the motion for summary judgment

(Doc. 49), filed by defendants Anthony Fetrow ("Fetrow") and York City Police

Department ("Police Department").  For the reasons that follow, the motion will be

granted.

**I.    Statement of Facts**[1]

---

[1] In accordance with the standard of review for a motion for summary
judgment, the court will present the facts in the light most favorable to Abdullah, as
the nonmoving party.  See infra Part II.  Constructing the facts was rendered more
difficult by the fact that many of the denials contained within Abdullah's responsive
statement of facts challenge not the factual accuracy of the averments but their
relevance, a subject suitable for legal arguments, not a Rule 56.1 responsive
statement.  (See, e.g, Doc. 60 ¶¶ 4, 12-14, 17); L.R. 56.1.  The court has conducted an
independent review of the record, but where no evidence supports Abdullah's
position, the court has accepted defendants' statement as true.  See L.R. 56.1 ("All
material facts set forth in the statement required to be served by the moving party
will be deemed to be admitted unless controverted by the statement required to be
served by the opposing party."); see also infra Part II.

The dispute in this case centers around a police investigation into allegations that Abdullah committed identity theft.  Abdullah claims that the investigation and the events that followed were prompted by discriminatory animus on the basis of race, sexual orientation, religion, and disability.  Abdullah is a homosexual, African-American male who adheres to the Muslim faith.  (Doc. 50 ¶¶ 2, 42; Doc. 60 ¶¶ 2, 42; Doc. 53, Ex. 1 at 147-48.)  Abdullah also suffers from a number of physical disabilities that resulted from a gunshot wound to the spine, including chronic back pain, partial paralysis, reflex problems, and bowel and urinary incontinence.  (Doc. 50 ¶¶ 3-4; Doc. 60 ¶¶ 3-4; Doc. 53, Ex. 1 at 12.)  Defendants counter that the investigation was prompted not by discriminatory animus but by a routine complaint filed by Abdullah's sister, Kareema Abdullah ("Kareema").

A.   **The Police Investigation**

In late 2002, Kareema contacted Fetrow, a detective with the York City Police Department, to report that Abdullah had used her social security number to obtain credit without her authorization.  (Doc. 50 ¶¶ 12, 16; Doc. 60 ¶¶ 12, 16; Doc. 53, Ex. 5 at 59.)  Kareema provided Fetrow with several documents in support of her claim, including a list of accounts opened by Abdullah using her social security number and fraud affidavits from the affected companies.  (Doc. 50 ¶ 19; Doc. 60 ¶ 19.)  As part of his investigation into Kareema's complaints, Fetrow requested further documentary support from the affected companies.  The documents confirmed that Abdullah had used Kareema's social security number on:  (1) the rental application

for his apartment, (2) a sales/finance agreement for the purchase of a 1988 Ford

Escort, and (3) at least two credit card applications.  (Doc. 50 ¶¶ 23-26, 30; Doc. 60

¶¶ 23-26, 30.)

Based upon the foregoing information, Fetrow applied for and was issued a

search warrant for Adbullah's apartment and garage.  (Doc. 50 ¶ 44; Doc. 60 ¶ 44.)

Among the list of items to be seized were Abdullah's 1988 Ford Escort and any

documentation regarding the allegedly fraudulent credit card accounts.  (Doc. 62,

Ex. 12 at 1.)  The affidavit of probable cause submitted in support of the search

warrant application reads, in pertinent part, as follows:

> On 4-28-02 a subject opened up [a] credit card account . . . at Pep Boys . . . .
> The subject gave the name of Khalid Abdullah, of 450 Madison Ave., Apt.
> #20, York, PA 17404, DOB -66, and used the §# -4424.  A credit card was
> issued to Khalid and numerous purchases were made . . ., accruing an
> outstanding balance of $232.97.

> On or around 4-29-02 a subject opened a credit card account . . . at Wal-Mart
> . . . .  The subject gave the same information as above and again made
> numerous purchases . . ., accruing an outstanding balance of $402.00. . . .

> On 5-9-02 a subject provided the same information and purchased a gold 1988
> Ford Escort . . . for $2,148.10 from Apple Ford . . . .  Khalid financed this
> purchase through Ford Motor Credit Corp.  Abdullah provided NY State
> Photo Driver's License # -2482 as proof of identification at the time of the
> sale.  The account has a current outstanding balance of over $1,900.00
> according to Ford Credit Corp., who has been unsuccessful in getting
> Abdullah to pay the loan or return the vehicle.

> Around 9-02, the victim Kareemah Abdullah . . . notified police that she had
> . . . discovered that her brother, Khalid Abdullah, had used her Social
> Security # above to open up the above credit accounts (and others) without
> her knowledge or consent.

(Id. at 2.)

Abdullah admits that he used his sister's social security number without her authorization, but denies that such use was intentional. (Doc. 50 ¶¶ 32-33; Doc. 60 ¶ 33.) To the contrary, Abdullah argues that he inadvertently used his sister's social security number because it differed from his by only one digit.[2] (Doc. 50 ¶ 18; Doc. 60 ¶¶ 18-19.)

### B.   The Search

At approximately 10:20 a.m. on June 4, 2003, Fetrow and three other officers executed the search warrant. (Doc. 50 ¶ 48; Doc. 60 ¶ 48.) Fetrow alleges that he knocked and announced the officers' presence at least three times and, after receiving no response, elected to enter the apartment using a key that he had obtained from Abdullah's landlord. (Doc. 50 ¶¶ 47, 51-52; Doc. 60 ¶ 47.) Abdullah denies that the officers knocked and announced their presence but admits that he was asleep at the time of the officers' entry. (Id. ¶¶ 47, 51, 53.)

When the officers entered the apartment, they found Abdullah and his life partner, Anthony Congelosi ("Congelosi"), asleep in the bedroom. (Doc. 50 ¶¶ 8, 53; Doc. 60 ¶¶ 8, 53.) Upon reaching the bedroom, Fetrow again announced the officers' presence. (Doc. 50 ¶ 54; Doc. 60 ¶ 54.) Abdullah alleges that the officers then began shouting "where's the drugs" and threatening to start "breaking the

---

[2] Abdullah's social security number ends in -4422, while Kareema's ends in -4424. (Doc. 50 ¶ 18; Doc. 60 ¶ 18.)

4

walls"[3] before advising him that they were executing a search warrant seeking evidence of identity theft. (Doc. 50 ¶ 55; Doc. 60 ¶ 55.)  Thereafter, Congelosi claims that he overheard the officers making "remarks about the fact that [he and Abdullah] were in bed together."  (Doc. 62, Ex. 2 at 53, 81-83.)  However, Congelosi admits that he did not hear Fetrow making such remarks.  (Id. at 54.)

The officers then directed Abdullah and Congelosi to sit on the couch in the living room while the apartment was searched.  Fetrow then determined that the two men did not pose a significant security threat and decided not to handcuff them. (Doc. 50 ¶¶ 60-61; Doc. 60 ¶¶ 60-61.)  At some point, Fetrow asked Abdullah to recite his social security number, and Abdullah did so correctly.  (Doc. 50 ¶ 64; Doc. 53, Ex. 1 at 66.)  Fetrow also found Abdullah's social security card in the same location as his driver's license and health insurance card, which indicated to Fetrow that Abdullah regularly carried the card.  (Doc. 50 ¶ 65; Doc. 60 ¶ 65.)  Finally, Fetrow located several documents containing Abdullah's correct social security number, indicating that Abdullah had used his correct number in the past.  (Doc. 50 ¶¶ 66-67; Doc. 60 ¶¶ 66-67.)  Fetrow then showed Abdullah a document containing Kareema's social security number and Abdullah, allegedly shocked by the erroneous use of his sister's number, offered to call the affected companies to correct the error.  (Doc. 53, Ex. 1 at 66; see also Doc. 50 ¶ 69; Doc. 60 ¶ 69.)  Fetrow

---

[3] Fetrow denies that any of the officers made reference to drugs or threatened to cause any property damage.  (Doc. 53, Ex. 5 at 120; Doc. 62, Ex. 4 at 183.)

declined Abdullah's offer.  (Doc. 53, Ex. 1 at 66.)  The officers then seized Abdullah's

vehicle, documents relating to the financing of the vehicle, and various credit cards

and credit card statements before advising Abdullah that he was under arrest.  (Id.

at 21; Doc. 50 ¶ 77; Doc. 60 ¶ 77.)

Before Abdullah was escorted from the apartment, he advised Fetrow that he

suffered from a disability, which included incontinence, and asked for permission to

put on an adult undergarment.  (Doc. 50 ¶ 72; Doc. 60 ¶ 72; Doc. 53, Ex. 5 at 123.)

Fetrow complied with Abdullah's request and permitted Abdullah to change his

clothes.  (Doc. 50 ¶¶ 74-75; Doc. 60 ¶¶ 74-75.)  Thereafter, Fetrow handcuffed

Abdullah.  Per the Police Department's normal practices, the handcuffs were

placed behind Abdullah's back.  (Doc. 50 ¶¶ 79-80; Doc. 60 ¶¶ 79-80.)  At some point,

Abdullah complained that the handcuffs were hurting his back and asked to be

handcuffed in front.  (Doc. 50 ¶¶ 81, 86; Doc. 60 ¶¶ 81, 86.)  Fetrow refused,

explaining that the ride to the police station would take only two minutes.  (Doc. 50

¶ 87; Doc. 60 ¶ 87.)  The officers then escorted Abdullah down the apartment

stairway, causing Abdullah's elbows to be elevated and allegedly aggravating the

injury to Abdullah's back.  (Id. ¶ 84.)  However, Abdullah admits that none of the

officers' actions caused him any permanent injury.  (Doc. 50 ¶ 95; Doc. 60 ¶ 95.)

While en route to the police station, the officers allegedly questioned Abdullah

about his homosexual lifestyle.[4]  (Doc. 53, Ex. 1 at 38.)

---

[4] Fetrow denies that such comments were made.  (Doc. 62, Ex. 4 at 132.)

## C.   <u>The Police Station</u>

Upon arriving at the police station, Fetrow removed Abdullah's handcuffs, placed him in an interview room, and read him <u>Miranda</u> warnings.  (Doc. 50 ¶¶ 89, 96; Doc. 60 ¶¶ 89, 96.)  Fetrow interviewed Abdullah until he requested an attorney, at which time Fetrow terminated the interview.  (Doc. 53, Ex. 5 at 133.)  After his interview, Abdullah was handcuffed to a restraining bench before he was processed.  (Doc. 50 ¶ 98; Doc. 60 ¶ 98; Doc. 53, Ex. 5 at 135.)  At some point, Abdullah purportedly asked to use the restroom and was forced to wait approximately twenty minutes before an officer responded.  (Doc. 50 ¶ 100; Doc. 60 ¶ 100; Doc. 53, Ex. 1 at 166.)  Abdullah then allegedly asked to be afforded a cell with a toilet to accommodate his disability, but the officer denied his request.[5]  (<u>Id.</u> at 38.) Abdullah also claims that the officers called him a "baby faggot," but Fetrow denies this contention.  (Doc. 50 ¶¶ 101-102; Doc. 60 ¶¶ 101-102.)

## D.   <u>The Aftermath</u>

On the advice of Assistant District Attorney Lee Cohen, Fetrow filed criminal charges of identity theft and access device fraud against Abdullah.  (Doc 50 ¶¶ 107-108; Doc. 60 ¶¶ 107-108; Doc. 62, Ex. 11 at 2.)  Ultimately, the charges were dismissed at the request of the Commonwealth.  (Doc. 50 ¶ 112; Doc. 60 ¶ 112.)

---

[5] Fetrow testified that he was not privy to Abdullah's request to be placed in a cell and that prisoners are typically handcuffed to the restraining bench as "a courtesy" because most individuals do not want to be confined in a cell.  (Doc. 62, Ex. 4 at 189.)

Thereafter, Abdullah attempted to regain possession of his vehicle, but he learned that Ford had repossessed the vehicle because the company's "collateral was in danger." (Doc. 50 ¶ 106; Doc. 60 ¶ 106; Doc. 53, Ex. 1 at 32.) Despite the repossession, Abdullah was required to pay Ford the contract balance. (Id. at 97, 185.) Abdullah now admits that, on the day of the search, his credit account with Ford had a past due balance of $126.45, but denies that Ford had made any attempts to repossess the vehicle prior to the search. (Doc. 50 ¶¶ 38-39; Doc. 60 ¶¶ 38-39.)

### E.    **Procedural History**

Following the court's ruling on defendant's motion to dismiss, Abdullah filed a second amended complaint against Fetrow and the Police Department. (Doc. 32.) The second amended complaint alleges that Fetrow violated Abdullah's rights pursuant to the Fourth, Fifth, and Fourteenth Amendments by: (1) unlawfully searching Abdullah's apartment and seizing his property, (2) falsely arresting him, (3) maliciously prosecuting him, (4) effecting an unlawful taking of his property, (5) violating his rights to procedural due process and equal protection, and (6) violating his right to privacy. The complaint also alleges that Fetrow committed various torts pursuant to state law, including malicious abuse of process, assault and battery, and intentional infliction of emotional distress. Finally, the complaint alleges that the Police Department should be held responsible for Fetrow's actions

because it failed to properly train and supervise Fetrow and was deliberately indifferent to his unconstitutional actions.  (See id.)

Defendants filed the instant motion for summary judgment, alleging that Abdullah has failed to state a claim for relief against them and that, even if a claim had been successfully asserted, they are entitled to qualified immunity.  (See Doc. 49.)  The motion has been fully briefed and is ripe for disposition.

## II.   <u>Standard of Review</u>

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact," and for which a jury trial would be an empty and unnecessary formality.  See FED. R. CIV. P. 56(c).  It places the burden on the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief.  Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see also FED. R. CIV. P. 56(c), (e).  Only if this threshold is met may the cause of action proceed.  Pappas, 331 F. Supp. 2d at 315.

III.   **Discussion**

Pursuant to § 1983, Abdullah alleges that defendants violated his rights pursuant to the Fourth, Fifth, and Fourteenth Amendments.  Abdullah further alleges that defendants committed several torts pursuant to state law.  The court will address these categories of claims *seriatim*.

A.   **Section 1983 Claims**

Section 1983 of Title 42 of the United States Code offers private citizens a means to redress violations of federal law by state officials.  See 42 U.S.C. § 1983. The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Id.  Section 1983 is not a source of substantive rights, but merely a method to vindicate violations of federal law committed by state actors.  Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).  To establish a claim under this section, the plaintiff must show a deprivation of a "right secured by the Constitution and the laws of the United States . . . by a person acting under color of state law."[6]  Id. (quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995)).

---

[6] Fetrow and the Police Department concede for purposes of the instant motion that they were acting "under color of state law" at all times relevant hereto. (Doc. 52 at 8-9.)

Satisfaction of these elements, however, does not guarantee recovery. Certain officials, including police officers and other state actors performing "discretionary functions," are shielded from suit if their conduct did not violate a "clearly established statutory or constitutional right[] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999); Saucier v. Katz, 533 U.S. 194, 200-01 (2001). This doctrine, known as "qualified immunity," provides not only a defense to liability, but "immunity from suit." Hunter v. Bryant, 502 U.S. 224, 227 (1991); Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). In Saucier, the Supreme Court explained the analytical process for determining when to apply the privilege of qualified immunity:

> A court required to rule upon the qualified immunity issue must consider . . . this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [defendant's] conduct violated a constitutional right? This must be the initial inquiry . . . . If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established.

Saucier, 533 U.S. at 201. Thus, the qualified immunity analysis requires a two-step inquiry.

> First, the court must determine whether the facts alleged show that the defendant's conduct violated a constitutional or statutory right. If so, the court must then determine whether the constitutional or statutory right allegedly violated by the defendant was "clearly established." If the court concludes that the defendant's conduct did violate a clearly established constitutional or statutory right, then it must deny the defendant the protection afforded by qualified immunity.

Williams v. Bitner, 455 F.3d 186, 190 (3d Cir. 2006); cf. Wright v. City of Phila., 409 F.3d 595 (3d Cir. 2005) (discussing whether the constitutional violation is a separate inquiry or part of the qualified immunity analysis); Kaucher v. County of Bucks, 455 F.3d 418, 423 n.2 (3d Cir. 2006).

When immunity is raised at the summary judgment stage, the court's analysis of the merits of the claims for purposes of summary judgment essentially merges with its analysis of the existence of a deprivation of federal rights for purposes of immunity. See Gruenke v. Seip, 225 F.3d 290, 299-300 (3d Cir. 2000); Russoli v. Salisbury Twp., 126 F. Supp. 2d 821, 838-41 (E.D. Pa. 2000); see also Grant v. City of Pittsburgh, 98 F.3d 116, 122 (3d Cir. 1996) ("[C]rucial to the resolution of [the] assertion of qualified immunity is a careful examination of the record . . . to establish . . . a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff).").

Abdullah has raised the following § 1983 claims against Fetrow: (1) unlawful search and seizure, false arrest, and malicious prosecution pursuant to the Fourth Amendment, (2) unlawful taking pursuant to the Fifth Amendment, (3) due process and equal protection violations pursuant to the Fourteenth Amendment, and

(4) right to privacy violations.  Abdullah also argues that the Police Department is liable under § 1983 because it fostered a policy or custom of discrimination and failed to properly train and supervise Fetrow.  Proceeding under the above framework, the court will consider each of Abdullah's § 1983 claims to determine, first, whether he has offered *prima facie* evidence of his claims and, second, whether defendants enjoy qualified immunity on those claims for which Abdullah has presented sufficient evidence.

### 1.  <u>Fourth Amendment Claims</u>

#### a.  <u>Unlawful Search</u>

Unlawful search and seizure claims require proof of an unconstitutional invasion of a plaintiff's "reasonable expectation of privacy" or a deprivation of his or her interest in property.  <u>See</u> <u>Soldal v. Cook County</u>, 506 U.S. 56, 62-64 (1992); <u>Rakas v. Illinois</u>, 439 U.S. 128, 133-35 (1978) (citing <u>Alderman v. United States</u>, 394 U.S. 165, 174 (1969)).  In the action *sub judice*, Abdullah alleges that:  (1) his apartment was unlawfully searched, and (2) his vehicle was unlawfully seized.

The court will turn first to the issue of the alleged unlawful search of Abdullah's apartment.  The parties concede that the search was conducted pursuant to a warrant.  <u>See</u> <u>Los Angeles County, Cal. v. Rettele</u>, __ U.S. __, 127 S. Ct. 1989, 1993 (2007) ("When officers execute a valid warrant . . ., the Fourth Amendment is not violated.").  However, Abdullah challenges the validity of the search warrant by asserting that Fetrow falsified the affidavit of probable cause.

13

(See Doc. 61 at 17-18.)  An affidavit of probable cause in support of a search warrant is entitled to a "presumption of validity."  Franks v. Delaware, 438 U.S. 154, 171 (1978).  To rebut this presumption, a plaintiff must prove that:  (1) the affiant "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant," and (2) "such statements or omissions are material, or necessary, to the finding of probable cause."  Sherwood v. Mulvihill, 113 F.3d 396, 399 (3d Cir. 1997); see also Wilson v. Russo, 212 F.3d 781, 786 (3d Cir. 2000).  A false assertion is deemed recklessly made if "viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported."  Id. at 788.  An omission is considered recklessly made if an affiant withholds a fact that "any reasonable person would have known . . . was the kind of thing the judge would wish to know."  Id.  False statements or omissions are deemed material to a magistrate's finding of probable cause if the affidavit is insufficient to establish probable cause once the false information has been redacted and the omitted information has been added.  Sherwood, 113 F.3d at 399-400 (citing Franks, 438 U.S. at 156).

In the instant case, Abdullah alleges that Fetrow falsely stated that: (1) Abdullah owed an outstanding balance of "over $1900.00" to Ford, and (2) Ford had been "unsuccessful in getting Abdullah to pay the loan or return the vehicle." (Doc. 62, Ex. 12 at 1.)  Abdullah further alleges that Fetrow omitted Abdullah's

social security number "which would have shown a difference from his sister['s] of only one digit." (Doc. 32 ¶ 13.)  Using the above standards, the court must first determine whether Fetrow knowingly or recklessly made these false statements or omissions and, if so, whether the statements or omissions are material.

With respect to the allegedly false information, the court finds no evidence of record to suggest that Fetrow "entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." See Wilson, 212 F.3d at 788.  To the contrary, Fetrow testified that he received oral information from Ford that supported the statements that the company had been "unsuccessful in getting Abdullah to pay the loan or return the vehicle" and that the outstanding loan balance was $1900.00.  (Doc. 50 ¶ 28; Doc. 60 ¶ 28.)  Abdullah admits that he has no evidence of record that would refute Fetrow's testimony regarding his discussions with a Ford representative.  (Doc. 53, Ex. 1 at 39 (stating that Abdullah has "no idea" whether Fetrow dealt with "Ford security")).  Given Fetrow's uncontroverted testimony, the court finds that Fetrow did not knowingly or recklessly include false statements in the probable cause affidavit.

Turning to the omitted material, Fetrow testified that he omitted Abdullah's social security number from the probable cause affidavit because he did not consider a suspect's personal, identifying information to be relevant to a search warrant application.  (Doc. 62, Ex. 4 at 162-63, 167.)  However, Fetrow knew that Abdullah was suspected of theft of a social security number and that Abdullah's

social security number differed from the allegedly stolen number by only one digit. The court finds that a reasonable officer armed with the foregoing information should have known that Abdullah's social security number was the "kind of thing the judge would wish to know," see Wilson, 212 F.3d at 788, and that, as a result, Fetrow's decision to omit Abdullah's social security number from the probable cause affidavit exhibited a "reckless disregard for the truth," see Sherwood, 113 F.3d at 399.

Nevertheless, the court finds that Fetrow's omission was not material to the magistrate's finding of probable cause because the addition of Abdullah's social security number to the probable cause affidavit does not affect the validity of the magistrate's finding. "Probable cause exists to support the issuance of a search warrant if, based on a totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place." Sherwood, 113 F.3d at 401 (citing Illinois v. Gates, 462 U.S. 213, 238 (1983)). Generally, the existence of probable cause in a § 1983 action is a question of fact; however, a district court may conclude as a matter of law that probable cause existed if the evidence of record would not reasonably support a contrary finding. Sherwood, 113 F.3d at 401.

In the instant case, Fetrow was seeking a search warrant because he believed that evidence of identity theft was likely to be found in Abdullah's apartment. Under Pennsylvania law, a person commits identify theft "if he possesses or uses,

through any means, identifying information of another person without the consent

of that other person to further any unlawful purpose."  18 PA. CONS. STAT. ANN.

§ 4120.  The probable cause affidavit establishes the essential elements of this

crime.  The affidavit states that Abdullah used Kareema's social security number to

open two credit card accounts and to purchase a vehicle "without her knowledge or

consent."  (Doc. 62, Ex. 12 at 2.)  To be sure, the criminal investigation was based

upon Kareema's direct and cogent complaints of identity theft and unauthorized

use.  While the similarity to Abdullah's social security number is a potentially

exculpatory fact, that fact alone is insufficient to undermine a finding of probable

cause when balanced against the volume of inculpatory facts included in the

affidavit.  See Wilson, 212 F.3d at 791-92.

Given the evidence that Abdullah had committed identity theft and the

nature of the items procured as a result of the theft, it would be reasonable for a

magistrate to conclude that evidence of the crime would be located in Abdullah's

residence.  See United States v. Hodge, 246 F.3d 301, 305 (3d Cir. 2001) (stating that

when issuing a search warrant, "[a] court is entitled to draw reasonable inferences

about where evidence is likely to be kept, based on the nature of the evidence and

the type of offense"); see also United States v. Waxman, 572 F. Supp. 1136, 1146

(E.D. Pa. 1983) (finding that where individual was suspected of theft, search of his

residence was appropriate because items were of the type that were likely to be

stored there).  The court finds that no reasonable jury could conclude that the

17

"corrected" warrant was unsupported by probable cause and that, accordingly, Abdullah has failed to rebut the presumption of validity afforded to search warrants. Based upon the foregoing information, defendants' motion for summary judgment will be granted with respect to the claim that deficiencies in the probable cause affidavit led to an unlawful search.

However, the court's inquiry into Abdullah's unlawful search claim does not end there. The Fourth Amendment also requires that officers knock and announce their presence before forcibly entering a residence. See Richards v. Wisconsin, 520 U.S. 385, 389-93 (1997); Kornegay v. Cottingham, 120 F.3d 392, 396 (3d Cir. 1997). In the instant case, Fetrow testified that he knocked and announced the officers' presence at least three times before entering Abdullah's apartment. (Doc. 50 ¶¶ 47, 51-52; Doc. 60 ¶ 47.) Abdullah admits that he was asleep at the time of the officers' entry but claims that he would have heard the officers knock and announce had they done so. (Id. ¶¶ 47, 51, 53.) The court finds Abdullah's allegations insufficient to create a genuine dispute of fact as to whether the officers knocked and announced their presence. In reaching its decision, the court is persuaded by the reasoning of the United States Court of Appeals for the Seventh Circuit in Molina ex rel. Molina v. Cooper, 325 F.3d 963 (7th Cir. 2003). In that case, the plaintiff was asleep when the defendant-police officers entered her residence to execute a search warrant. Id. at 972. The plaintiff claimed that the officers failed to knock and announce and testified that she "awoke to 'screaming and yelling' but could not

understand what was being said." Id.  The Seventh Circuit held that because the plaintiff was asleep at the time the warrant was executed, her assertions could not create a "genuine dispute as to whether the officers 'knocked and announced.'" Id. Like the plaintiff in Molina, Abdullah admits that he was asleep in his bedroom at the time of the officers' entry.  Abdullah further admits that his bedroom door was closed and that a fan was running, which eviscerates Abdullah's contention that he would have heard the officers knock had they done so.  (Doc. 53, Ex. 1 at 19.) Accordingly, defendants' motion for summary judgment will be granted with respect to the claim that a failure to knock and announce led to an unlawful search.

The court turns next to the issue of the seizure of Abdullah's vehicle. Defendants argue that the vehicle was seized pursuant to a valid search warrant which lists the vehicle among the items to be seized.  (Doc. 52 at 14; see also Doc. 62, Ex. 12 at 1.)  In response, Abdullah fails to offer any argument to support his unlawful seizure claim.  (See Doc. 61 at 17-18 (failing to mention an unlawful seizure claim during the discussion of Abdullah's claims pursuant to the Fourth Amendment)).  Accordingly, the court concludes that Abdullah has abandoned this claim.  See D'Angio v. Borough of Nescopeck, 34 F. Supp. 2d 256, 265 (M.D. Pa. 1999) (noting that abandonment of a position is tantamount to waiver); see also L.R. 7.6.  The court will grant defendants' motion for summary judgment with respect to the claim of unlawful seizure.

### b.  **False Arrest**

Claims of false arrest pursuant to § 1983 require a plaintiff to show that he or she was arrested without probable cause.  Groman v. Twp. of Manalapan, 47 F.3d 628, 634-35 (3d Cir. 1995); see also Berg v. County of Allegheny, 219 F.3d 261, 268-69 (3d Cir. 2000).  Probable cause to arrest requires "proof of facts and circumstances that would convince a reasonable, honest" officer that the person arrested has committed a crime.  Lippay v. Christos, 996 F.2d 1490, 1502 (3d Cir. 1993); see United States v. Myers, 308 F.3d 251, 255 (3d Cir. 2002).  Thus, the issue is not whether an individual actually committed the crimes for which he or she was arrested, but whether the police had probable cause to believe that the individual committed those crimes at the time of his or her arrest.  Groman, 47 F.3d at 634; see also Baker v. McCollan, 443 U.S. 137, 145 (1979) ("The Constitution does not guarantee that only the guilty will be arrested.  If it did, § 1983 would provide a cause of action for every defendant acquitted - indeed, for every suspect released.").

To determine if Fetrow possessed probable cause to arrest Abdullah, the court must examine only the evidence available to Fetrow at the time of Abdullah's arrest.  At the time of Abdullah's arrest, Fetrow knew that:  (1) Abdullah had repeatedly used Kareema's social security number without her permission, (2) Abdullah was able to recite his own social security number correctly from memory, (3) Abdullah kept his social security card in a readily accessible location, and (4) Abdullah had used his correct social security number on several financial

documents found in his apartment.  <u>See</u> <u>supra</u> Parts I.A, I.B.  The court finds that a reasonable, honest officer armed with the foregoing information would have concluded that Abdullah had committed the crime of identify theft and would have been justified in procuring his arrest.  While Fetrow was aware that Abdullah's social security number differed from his sister's by only one digit, such evidence at best establishes the affirmative defense of mistake of fact.  <u>See</u> 18 PA. CONS. STAT. ANN. § 304 (defining the affirmative defense of "ignorance or mistake as to a matter of fact").  As our sister court in the Eastern District stated in <u>Corbett v. Goode</u>, No. 87-7360, 1990 WL 181499 (E.D. Pa. Nov. 19, 1990),

> The availability of an affirmative defense focuses on the ultimate analysis of guilt *at trial*, but has nothing to do with whether the threshold elements of the offense, or probable cause, existed *at the time of arrest*.  In order to assert [an] affirmative defense, [a] plaintiff must first admit that she committed the crime . . . as charged.  Logically, an admission that she committed the act charged also constitutes an admission that probable cause existed.

<u>Id.</u> at *5 (emphasis in original); <u>see also</u> <u>Dowling v. City of Phila.</u>, 855 F.2d 141, 142 n.6 (3d Cir. 1988).  Accordingly, Abdullah's claimed defense of mistake of fact has no bearing on the probable cause finding, and defendants' motion for summary judgment with respect to this claim will be granted.

### c.  <u>Malicious Prosecution</u>

A claim of malicious prosecution requires a plaintiff to prove that:  (1) the defendants initiated a criminal proceeding, (2) the criminal proceeding ended in plaintiff's favor, (3) the proceeding was initiated without probable cause, (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to

justice, and (5) the plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.  Estate of Smith v. Marasco, 318 F.3d 497, 521 (3d Cir. 2003); see also Marable v. West Pottsgrove Twp., 176 F. App'x 275, 280-81 (3d Cir. 2006).  The court's conclusion that Fetrow possessed probable cause to effect Abdullah's arrest forecloses Abdullah's malicious prosecution claim as a matter of law.  Amato v. Pa. Office of Attorney Gen., 183 F. App'x 260, 262 n.1 (3d Cir. 2006) ("[I]f probable cause is established, a malicious prosecution claim fails as a matter of law.")  Accordingly, defendants' motion for summary judgment will be granted with respect to Abdullah's malicious prosecution claim.

## 2.  Fifth Amendment Claim

The Fifth Amendment Takings Clause "proscribes the taking of private property for public use, without just compensation."  U.S. CONST. amend. V; see also Cowell v. Palmer Twp., 263 F.3d 286, 290 (3d Cir. 2001).  It is well-settled that this prohibition applies to *local* governments under the Fourteenth Amendment. Chicago, Burlington & Quincy R.R. Co. v. City of Chicago, 166 U.S. 226, 239 (1897); Cowell, 263 F.3d at 290.  In the instant case, Abdullah alleges that Fetrow seized his vehicle "and improperly disposed of it" without providing him just compensation. (See Doc. 61 at 19.)  Contrary to Abdullah's position, a review of the search warrant in the instant case reveals that Abdullah's vehicle was explicitly listed among the items to be lawfully seized.  (Doc. 62, Ex. 12 at 1); see also Doe v. Groody, 361 F.3d

232, 239 (3d Cir. 2004) (stating that a warrant "must be read in a common sense, non-technical fashion").  Moreover, the evidence of record indicates that Abdullah's vehicle was repossessed by Ford, rather than "disposed of" by Fetrow.  (Doc. 50 ¶ 106; Doc. 60 ¶ 106.)

These facts do not rise to the level of a taking as contemplated by the Fifth Amendment.  The Takings Clause "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."  Armstrong v. United States, 364 U.S. 40, 49 (1960).  Accordingly, where the government acts to secure a benefit for the public, a taking arises.  Id.  However, lawful police actions, like those undertaken in the instant case, do not constitute a taking under the Fifth Amendment because "items properly seized by the government under its police power are not seized for 'public use' within the meaning of the Fifth Amendment."  Acadia Tech., Inc. v. United States, 458 F.3d 1327, 1332 (Fed. Cir. 2006); see also Seay v. United States, 61 Fed. Cl. 32, 35-36 (2004) ("[G]overnment action aimed at protecting its citizens traditionally has constituted a non-compensable exercise of the government's police power.").  Accordingly, the court will grant summary judgment in favor of defendants with respect to Abdullah's Fifth Amendment claim.

### 3.    **Fourteenth Amendment Claims**

The Fourteenth Amendment prohibits a state from "depriv[ing] any person of life, liberty, or property, without due process of law" and from "deny[ing] to any

person within its jurisdiction the equal protection of the laws." U.S. CONST. amend.
XIV.  Abdullah claims violations of his due process and equal protection rights, and
the court will address each claim in turn.

### a.   __Due Process__[7]

To prevail on a procedural due process claim, a plaintiff must demonstrate
that a liberty or property interest was taken in a procedurally deficient manner.
Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 570-71 (1972); Henry v. Dept.
of Correc., 131 F. App'x. 847, 848 (3d Cir. 2005).  In the instant case, Abdullah alleges
that his "liberty interest was taken pursuant to [Fetrow's] bias against [Abdullah]
because of his protected status."  (Doc. 61 at 19.)  While Abdullah does not clearly
articulate the procedures that Fetrow allegedly failed to follow, all such procedures
apparently relate to Fetrow's reliance upon, and execution of, the search warrant.
(See id.)  The United States Supreme Court has stated that the Fourth Amendment
"was tailored explicitly for the criminal justice system, and its balance between
individual and public interests always has been thought to define the 'process that
is due' for seizures of persons or property in criminal cases."  Gerstein v. Pugh, 420

---

[7]  The Fourteenth Amendment's "generalized notion of substantive due
process" does not apply where, as here, "a particular Amendment provides an
explicit textual source of constitutional protection against a particular sort of
government behavior."  County of Sacramento v. Lewis, 523 U.S. 833, 842 (1998).
An explicit source of protection is provided by the Fourth Amendment in the
instant case, so Abdullah's claim must fail to the extent that is premised upon
generalized notions of substantive due process.  See James v. York County Police
Dept., 160 F. App'x 126, 132 n.3 (3d Cir. 2005).

U.S. 103, 125 n.27 (1975).  Having previously concluded that Fetrow's actions

satisfied the strictures of the Fourth Amendment, see supra Part III.A.1, the court

finds that Abdullah was afforded the appropriate level of process.  Accordingly,

defendants' motions for summary judgment will be granted with respect to

Abdullah's procedural due process claim.

### b.  Equal Protection

The Equal Protection Clause of the Fourteenth Amendment directs that all

individuals similarly situated be treated alike.  City of Cleburne v. Cleburne Living

Ctr., 473 U.S. 432, 439 (1985).  To establish a *prima facie* case of discrimination

under the Equal Protection Clause, a plaintiff must prove that he or she:  (1) was a

member of a protected class, and (2) received different treatment than that received

by similarly situated individuals.  Oliveira v. Twp. of Irvington, 41 F. App'x 555, 559

(3d Cir. 2002).  The latter element may be satisfied by "naming similarly situated

members of an *unprotected* class who were [treated differently] or, in some cases, by

submitting statistical evidence of bias."  Bradley v. United States, 299 F.3d 197, 206

(3d Cir. 2002) (emphasis added); see also Livingston ex rel. Livingston v. Borough of

McKees Rocks, 223 F. App'x 84, 88 (3d Cir. 2007) (affirming grant of summary

judgment on equal protection claim for lack of evidence that similarly situated

members of unprotected class were not subjected to same adverse treatment).

In the instant case, Abdullah asserts that Fetrow's actions were prompted by

discriminatory animus on the basis of his race, sexual orientation, religion, and

disability.  Despite Abdullah's membership in the aforementioned classes, the court finds that Abdullah's equal protection claims are bereft of proof.  Abdullah has failed to establish that Fetrow treated similarly situated members of *unprotected* classes differently than he treated Abdullah.  <u>See</u> <u>Bradley</u>, 299 F.3d at 206. Nor has Abdullah presented statistical evidence of bias sufficient to support his claim.  <u>See</u> <u>id.</u> While Abdullah has suggested that Fetrow and other officers engaged in harassing and demeaning behavior on the basis of his sexual orientation and disability, such behavior is insufficient to establish an equal protection claim absent evidence that similarly situated individuals outside of those protected classes received different treatment.  <u>Oliveira</u>, 41 F. App'x at 560 (affirming grant of summary judgment on equal protection claim for failure to establish similarly situated element, despite allegations that plaintiff was harassed and called racially demeaning names).  Accordingly, the court will grant defendants' motion for summary judgment with respect to the equal protection claim.

### 4.   <u>Right to Privacy</u>

The United States Supreme Court has recognized the existence of an "implied right to privacy inherent in the Constitution."  <u>See</u> <u>Akins v. Kasheta</u>, No. 06-1704, 2006 WL 2828821, at *5 (M.D. Pa. Sept. 29, 2006) (citing <u>Griswold v. Connecticut</u>, 381 U.S. 479, 485-86 (1965)).  There are generally two categories of protected privacy interests:  (1) the "interest in independence in making certain kinds of important decisions," and (2) the "interest in avoiding disclosure of

personal matters." <u>Whalen v. Roe</u>, 429 U.S. 589, 599-600 (1977).  The former interest is implicated by governmental actions that limit an individual's ability to participate in private activities such as consensual intercourse, <u>see, e.g.,</u> <u>Lawrence v. Texas</u>, 539 U.S. 558 (2003), while the latter interest is implicated by governmental disclosure of "information concerning an individual's sexual matters or his body and health," <u>Akins</u>, 2006 WL 2828821, at *5 (citing <u>Whalen</u>, 429 U.S. at 602).  In the instant case, Abdullah claims a violation of the latter interest.  Specifically, Abdullah alleges that his right to privacy was violated by Fetrow's decision to indicate that Abdullah had a "Live in Boyfriend" in the section labeled "Additional Information/Remarks" on the York City Police Arrest and Booking Form.  (<u>See</u> Doc. 61 at 8; <u>see also</u> Doc. 62, Ex. 17.)

To prevail on a right to privacy claim, a plaintiff must establish that the claimed privacy right is fundamental.  <u>Doe v. Se. Pa. Transp. Auth.</u>, 72 F.3d 1133, 1137 (3d Cir. 1995).  The United States Court of Appeals for the Third Circuit "takes an encompassing view of information entitled to a protected right to privacy." <u>Sterling v. Borough of Minersville</u>, 232 F.3d 190, 195 (3d Cir. 2000).  In <u>Sterling</u>, the Third Circuit considered whether the right to privacy prevents the disclosure of an individual's sexual orientation.  In that case, a police officer investigating a suspected burglary observed two male teenagers in a parked car.  The officer approached the car and asked the individuals what they were doing.  After receiving evasive responses, the officer searched the car and discovered two

condoms, after which the individuals admitted that they intended to engage in

consensual sex.  The officer arrested the individuals for underage drinking and

transported them to the police station.  Id. at 192.  At the station, the officer

"lectured them that the Bible counseled against homosexual activity."  Id. at 192-93.

The officer then threatened to disclose the sexual orientation of one of the

individuals to a family member from whom it had intentionally been kept private,

which led the suspect to commit suicide.  Id.  After considering these facts, the

Third Circuit stated that the suspect's "sexual orientation was an intimate aspect of

his personality entitled to privacy protection" and that disclosure of such

information could be justified only by a "genuine, legitimate and compelling"

governmental interest.  Id. at 196.

Despite the extensive protections which the Third Circuit affords to privacy

rights, the court finds that such protections are not implicated by the facts of the

instant case.  In Sterling, the decedent was threatened with the *forced* disclosure of

his sexual orientation to an individual from whom it had intentionally been kept

secret.  Id. at 192-93.  Unlike the decedent in Sterling, there is no evidence of record

to suggest that Abdullah kept his sexual orientation secret.  To the contrary,

Abdullah testified that his sexual orientation was readily observable and that he has

lived with his life partner for fifteen years. (Doc. 53, Ex. 1 at 23; Doc. 53, Ex. 3 at 15-

16.) Given this marked difference, the court finds that the disclosure in the instant

case was accompanied by none of the risks of harm attendant to the disclosure in

<u>Sterling</u>.  Moreover, the officer in <u>Sterling</u> apparently threatened to reveal the decedent's sexual orientation in an attempt to dissuade him from engaging in consensual sexual activity because of a personal ideological aversion towards homosexuality.  232 F.3d at 192-93.  In the instant case, Fetrow revealed Abdullah's sexual orientation on a routine administrative form, an act which harbored none of the discriminatory animus evident in the officer's actions in <u>Sterling</u>.  (Doc. 62, Ex. 17.)  Moreover, the information disclosed was intended to serve legitimate penological interests by providing complete information about individuals who were likely to be present at the time of the search or to inquire about or visit Abdullah after his arrest.  The court finds that Fetrow's disclosure of Abdullah's sexual orientation was limited at best and was narrowly tailored to serve the aforementioned objectives.  <u>See</u> <u>Depiano v. Alt. County</u>, No. 02-5441, 2006 WL 1128710, at *7 (D.N.J. Apr. 25, 2006) (considering limited disclosure of photographs of male plaintiff dressed in women's attire among reasons to deny invasions of privacy claim).  Accordingly, defendants' motion for summary judgment will be granted with respect to Abdullah's right to privacy claim.

### 5.   **Claims against Police Department**

Abdullah also argues that the Police Department is liable under § 1983.  As an agency of York County, the Police Department's liability for Abdullah's claims must be assessed using the specialized principles applicable to local government entities.  (Doc. 50 ¶ 15; Doc. 60 ¶ 15.)  Local government entities may not be held

liable under § 1983 for the acts of their employees under a theory of *respondeat superior* or vicarious liability.  Bd. of County Comm'rs v. Brown, 520 U.S. 397, 403 (1997); see also Colburn v. Upper Darby Twp., 946 F.2d 1017, 1027 (3d Cir. 1991). However, a local government entity may be held liable if the plaintiff can identify an official policy or custom that caused the plaintiff's injury."  Id. (citing Monell v. Dep't of Social Servs., 436 U.S. 658, 694 (1978)).  A policy is an official proclamation or edict of a local government entity, while a custom is a practice that is "so permanent and well settled as to virtually constitute law."  Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996) (quoting Andrews v. City of Phila., 895 F.2d 1469, 1480 (3d Cir. 1990) (citations omitted).

In the instant case, Abdullah suggests that the Police Department fosters a policy or custom of racism by:  (1) enforcing its citizen's complaint process in a discriminatory manner, (2) engaging in racial profiling, and (3) directing racially derogatory statements towards suspects.  (See Doc. 53, Ex. 1 at 111-14, 121-22, 137; Doc. 62, Ex. 13 at 81.)  Even assuming *arguendo* that such practices exist within the Police Department, Abdullah has proffered no evidence to suggest that such practices caused his alleged constitutional injuries.  To the contrary, Abdullah admits that he did not participate in the citizen's complaint process.  (Doc. 53, Ex. 1 at 122.)  Moreover, Abdullah was investigated because of a complaint lodged by his sister, not because of a policy or custom of racial profiling.  (Doc. 50 ¶ 17.)  Nor is there any evidence of record to suggest that the officers directed any racially

derisive comments toward Abdullah.[8]  Because Abdullah has failed to establish the

causation element of a policy or custom claim, the court will grant defendants'

motion for summary judgment with respect to that claim.

A local government entity may also be held liable for a failure to train its

employees if the failure to train "amounts to deliberate indifference to the

constitutional rights of persons with whom the police come in contact."  Colburn,

946 F.2d at 1028 (citing City of Canton v. Harris, 489 U.S. 378, 388 (1989)).  In the

instant case, the court finds no evidence of record to establish that the Police

Department was on notice of, let alone deliberately indifferent to, a need for further

training on the part of Fetrow.  To the contrary, the evidence of record indicates

that Fetrow is well-trained, having successfully completed the police academy,

received all required annual updates, and participated in hundreds of hours of

additional training.  (Doc. 50 ¶¶ 13-14.)  Abdullah suggests that Fetrow's inability to

recall his last cultural diversity training suggests that he is inadequately trained.

(Doc. 62, Ex. 4 at 196-97.)  However, the court finds this allegation alone insufficient

to hold the Police Department liable under a failure to train theory.  There is no

evidence of record to suggest that Fetrow had a history of constitutional rights

---

[8]  The court notes that Abdullah testified that the officers made derogatory
comments regarding his sexual orientation and disability.  See supra Parts I.B, I.C.
However, Abdullah has not identified a Police Department policy or custom that
fosters discrimination on these bases.

violations or of insensitivity to issues of cultural diversity.[9]  <u>King v. City of</u>

<u>Gloucester</u>, No. 03-5863, 2007 WL 2669409, at *9 (D.N.J. Sept. 6, 2007) ("[M]ore proof

than a single incident [is] necessary to establish both the requisite fault on the part

of the municipality and the causal connection between the 'policy' and the

constitutional deprivation.") (quoting <u>City of Oklahoma City v. Tuttle</u>, 471 U.S. 808,

824 (1985)).  Accordingly, the court finds no evidence to suggest that the Police

Department was on notice of or deliberately indifferent to the purported

inadequacies in Fetrow's training.  <u>See</u> <u>Colburn</u>, 946 F.2d at 1028.  The court will

grant defendants' motion with respect to the failure to train claim.

**B.   <u>State Law Claims</u>**[10]

The only remaining claims are tort claims pursuant to state law.  However,

the parties have not articulated specific reasons for the court to entertain these

claims in the absence of a federal cause of action, and the court declines to do so.

<u>See</u> 28 U.S.C. § 1367(c) ("The district court[] may decline to exercise supplemental

jurisdiction over a [state law] claim . . . if . . . the district court has dismissed all

---

[9]  The court notes that Abdullah attempts to establish such evidence by suggesting that Fetrow was a member of a police unit that received numerous citizen's complaints about racial profiling and harassment.  (Doc. 60 ¶ 125.)  The court finds Abdullah's mere speculation woefully insufficient to establish that Fetrow ever personally participated in any unconstitutional or racially demeaning actions.

[10]  Having found that Abdullah has failed to offer *prima facie* evidence of any § 1983 claims, the court need not address the subsequent issue of whether Abdullah's rights were clearly established.  <u>See</u> <u>supra</u> Part III.A (discussing qualified immunity defense).

claims over which it has original jurisdiction."); <u>Borough of West Mifflin v.</u>

<u>Lancaster</u>, 45 F.3d 780, 788 (3d Cir. 1995) ("[W]here the claim over which the district

court has original jurisdiction is dismissed before trial, the district court *must*

decline to decide the pendent state claims unless considerations of judicial

economy, convenience, and fairness to the parties provide an affirmative

justification for doing so.") (emphasis added).

**IV.**   **Conclusion**

For the foregoing reasons, the court will grant the motion for summary

judgment (Doc. 49).  An appropriate order will issue.


   S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge


Dated:        September 26, 2007

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KHALID ABDULLAH,** | : | **CIVIL ACTION NO. 1:05-CV-1135** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **ANTHONY FETROW and** | : | |
| **YORK CITY POLICE DEPARTMENT,** | : | |
| | : | |
| **Defendants** | : | |

## ORDER

AND NOW, this 26th day of September, 2007, upon consideration of

defendants' motion for summary judgment (Doc. 49), and for the reasons set forth in

the accompanying memorandum, it is hereby ORDERED that:

1.    The motion for summary judgment (Doc. 49) is GRANTED.

2.    The Clerk of Court is directed to enter JUDGMENT against plaintiff
      and in favor of defendants on all claims arising under federal law.

3.    The Clerk of Court is directed to CLOSE this case.


      S/ Christopher C. Conner
      CHRISTOPHER C. CONNER
      United States District Judge